# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

ANTHONY D.[1],

                                        Plaintiff,

              v.                                        6:17-CV-1326
                                                        (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

HOWARD D. OLINSKY, ESQ., for Plaintiff
ELIZABETH ROTHSTEIN, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## MEMORANDUM-DECISION and ORDER

This matter was referred to me, for all proceedings and entry of a final judgment,

pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in

accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y.

Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 5).

## I.    PROCEDURAL HISTORY

On June 22, 2012, plaintiff filed an application for Supplemental Security

Income ("SSI"), alleging disability beginning September 15, 2010. (Administrative

Transcript ("T.") 136-45).  Plaintiff's July 9, 2012 "Disability Report" indicates that

plaintiff alleged disability based upon Attention Deficit Hyperactivity Disorder

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

("ADHD"), left leg and ankle problems, flat feet, and memory problems.[2] (T. 164). The application was denied initially on September 12, 2012. (T. 60-64). Plaintiff requested a hearing, which was held before Administrative Law Judge ("ALJ") Lisa Martin on October 28, 2013. (T. 29-52). On February 26, 2014, ALJ Martin issued an order denying plaintiff's application. (T. 14-22). The Appeals Council denied plaintiff's request for review (T. 1-4), and plaintiff filed a civil action in the Northern District of New York. (T. 433-41). The case was thereafter remanded to the Commissioner for further administrative proceedings by stipulation of the parties dated May 6, 2016. (T. 450-53).

On January 4, 2017, the Appeals Council vacated ALJ Martin's decision and remanded the matter to a new ALJ, consolidating the action with a subsequent SSI application that plaintiff filed on December 8, 2016. (T. 459-61). The Appeals Council remanded the case with some specific instructions for the new ALJ. (T. 459-61). Plaintiff appeared for a hearing before ALJ Kenneth Theurer on August 7, 2017. (T. 388-430). Vocational Expert ("VE") Josiah Pearson testified at the hearing. (T. 418-30). On October 6, 2017, ALJ Theurer issued a decision, finding that plaintiff was not disabled. (T. 359-80). According to the regulations on remand, after the ALJ's decision became final, plaintiff filed this action. (*See* T. 357); 20 C.F.R. § 404.984(a).

---

[2] This Disability Report states that plaintiff's alleged onset date was September 17, 2011. (T. 160). This report also indicates that plaintiff had a prior application for benefits which was denied initially on June 24, 2011. (*Id.*) The prior application is not relevant to this action, and the difference in the onset date does not affect the decision in this case.

## II.   GENERALLY APPLICABLE LAW

### A.   Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the

3

residual functional capacity to perform his past work. Finally, if the
claimant is unable to perform his past work, the [Commissioner] then
determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that her impairment prevents her from performing

her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d at 417; *Brault v. Soc. Sec. Admin,

Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence

is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012). It must be "more

than a scintilla" of evidence scattered throughout the administrative record. *Id.*

However, this standard is a very deferential standard of review " – even more so than

the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial

evidence, a reviewing court considers the whole record, examining the evidence from

both sides, because an analysis of the substantiality of the evidence must also include

that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859

F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its

interpretation of the administrative record for that of the Commissioner, if the record

contains substantial support for the ALJ's decision. *Id*. *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010).

## III. <u>FACTS</u>

Plaintiff was 32 years old at the time of his second ALJ hearing and lived in an apartment with his mother and her boyfriend. (T. 395-96). Plaintiff finished the eleventh grade in high school, receiving special education services.[3] (T. 397). He subsequently obtained his GED, after attending two years of preparatory classes. However, plaintiff testified that it took two or three tries for him to pass the examination. (T. 397, 409).

Plaintiff had past relevant work ("PRW") as a "cart pusher" and sales associate at Wal-Mart, a job which he held for approximately two or three years. (T. 398). The cart-pusher job involved getting carts out of the parking lot and putting them back in the store. (T. 398). As a sales associate,[4] plaintiff stocked shelves and helped customers

---

[3] Special Education was not specifically referenced during the hearing, but it is clear from the record that plaintiff received special education services. (T. 190-209).

[4] Plaintiff testified that he only held the sales associate job for five or six months. (T. 398).

find items in the store. (*Id.*) Plaintiff testified that he worked at Lowe's as a cashier for approximately five months. (T. 399). As a cashier, some of his responsibilities included helping customers bring purchases to their cars. (T. 400).

Plaintiff testified that he was fired from both Wal-Mart and Lowe's because he had a hard time "monitoring" his lunch or his time, and he would forget to "punch in." (T. 399, 401). Plaintiff stated that he was still looking for work, and that he tried to fill out applications on line, but could not get a job. (T. 401). Plaintiff stated that he tried to get a job at Target the month before his hearing, but that the store would not take him. (*Id.*)

The ALJ asked plaintiff about the conditions that prevent him from working. (T. 403-404). Plaintiff testified that he has a "leg problem," and he has no arches, so he has trouble walking. (T. 403). However, plaintiff conceded that he was given inserts for his shoes, and that the inserts "sometimes" worked, but that they dry out and "evaporate," so he had to get more. (T. 403-404). Plaintiff stated that the "mental health condition" that kept him from working was his "memory." (T. 404). Plaintiff stated that he cannot "really remember, sometimes, certain things," and that one day, he can focus, but after that, he forgets. (*Id.*)

In response to the plaintiff's testimony, the ALJ asked plaintiff how he could have worked at Wal-Mart for two years with that impairment. (*Id.*) Plaintiff stated that he could do the Wal-Mart work because "[a]ll you had to do was push carts. That was basic." (*Id.*) Plaintiff agreed that he could still "do basic stuff like that," but that if he tried to do something else in the store, he would forget any training that he was given.

(*Id.*)

Plaintiff testified that he could bathe and dress himself, but could not cook or do the laundry. (T. 405). Plaintiff stated that he slept a lot during the day. (T. 406). Plaintiff stated that his doctors' appointments were scheduled in the morning, and that his mother woke him up on the days that he had appointments. (T. 407). Plaintiff stated that he could not "do" much because he had to rely on the bus, and the last bus "over there" was at 5:00 p.m., so after that, "you really can't do anything." (T. 407). Plaintiff stated that he did not play on the computer, nor did he have a "smart" phone because they did not have internet where he lived. (T. 408). Plaintiff took the bus when he needed to go somewhere, but most of the time, he stayed home and watched television. (*Id.*)

In response to his attorney's questioning, plaintiff implied that he had trouble filling out computerized applications, and that he also struggled with the cart-pusher job because he could not remember the things that he was shown. (T. 409-411). Plaintiff also testified that one of his mental issues was paranoia as well as occasional visual and auditory hallucinations. (T. 411-12). Plaintiff also testified that he had some anger management issues, but that he could "pretty much keep it in check." (T. 412). Plaintiff testified that when he became angry, he would become "destructive" and punch "things." He had thoughts of hurting himself, but never acted on them. (T. 412-13). Plaintiff stated that he tried not to be around people, and that his moods fluctuated randomly. (T. 413-14).

Plaintiff testified that his mother sometimes had to help him do things. She

cooked and did the laundry because plaintiff would not do dishes properly, would forget about the microwave, and would burn clothes if he tried to iron them. (T. 415). Plaintiff stated that he could grocery shop "a little," but that it was hard to stay focused on what he was supposed to get, and he would fail to purchase "essentials." (T. 415-16). Plaintiff's mother did most of the grocery shopping, and plaintiff helped her bring the groceries into the house.[5] (T. 416). Plaintiff testified that he could not write a check, use a debit card, or pay bills on his own, and he had a hard time concentrating on things that he tried to read. (T. 416-17). He stated that he could not "do" math or make change. (T. 417).

The ALJ then called the VE as a witness. (T. 418). VE Pearson reviewed the requirements of plaintiff's PRW. (T. 419-20). The ALJ asked the VE two hypothetical questions, each with a different RFC for the plaintiff. (T. 420-24). In the first hypothetical question, the ALJ asked the VE to consider an individual who could perform the exertional requirements for medium work, except that, in addition to "normal breaks," he would need to sit down hourly for one to two minutes and would be limited to routine, uninvolved tasks, not requiring a "fast assembly quota pace." (T. 420). The VE testified that, given those restrictions, an individual could still perform all of plaintiff's PRW, the cashier, the cart-pusher, and the sales attendant. (T. 421).

The second hypothetical asked the VE to assume that the individual had the exertional ability to perform medium work with some additional restrictions not present

---

[5] Plaintiff testified that he only went shopping once in his life, and the ALJ questioned this statement because plaintiff "worked in a store." (T. 416). Plaintiff responded "yes," but he only bought junk food. (*Id.*)

in the first hypothetical. (T. 421-22). These restrictions did not include the necessity to sit down hourly, but allowed for sitting, standing, or walking for six hours per day with normal breaks. (T. 421). The hypothetical individual would be able to occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and could occasionally balance, stoop, kneel, crouch, or crawl. (*Id.*)

Mentally, the hypothetical individual could understand and follow simple directions and perform simple tasks, both independently and with supervision. (T. 421). The individual could maintain attendance and concentration for simple tasks, could regularly attend to a routine and maintain a schedule, could relate to and interact with others to the extent necessary to carry out simple tasks, but should avoid work requiring more complicated interaction or joint effort to achieve goals. (T. 422) The individual should not have more than incidental contact with the public, but could handle a reasonable level of work-related stress and could make occasional simple decisions that were directly related to the completion of his tasks in an unchanging work environment, free from fast paced production requirements. (*Id.*)

In response to the second hypothetical question, the VE testified that plaintiff could not perform any of his PRW because of the restriction on contact with the public. (T. 422). However, the VE listed three alternative jobs within the national economy that the individual could perform: Laundry Laborer (medium work), Housekeeping Cleaner (light work), and Garment Folder (light work). (T. 424). The VE stated that an individual could not have more than one unscheduled absence per month and could not be "off-task" more than 8% of the time in order to work competitively. (T. 424-25). In

response to questioning by plaintiff's counsel, the VE stated that if an individual had to be reminded what to do twice per hour, he could still perform the work itself, but that the reminders would be considered "accommodations," and the work would not be considered competitive employment. (T. 426-27).

The ALJ's decision and the plaintiff's brief provide a detailed statement of the medical and other evidence of record. (T. 363-66, 368-74, Pl.'s Br. at 3-9 (Dkt. No. 11)). Defendant has incorporated the summary of the facts and procedural history as stated in the ALJ's decision. (Def.'s Br. at 2) (Dkt. No. 14). Rather than reciting the medical evidence at the outset, the court will discuss the relevant details below, as necessary to address the issues raised by plaintiff and with any modifications noted in the decision.

## IV.   THE ALJ'S DECISION

After reviewing the procedural history of the plaintiff's application, the ALJ found that plaintiff had not engaged in substantial gainful activity since June 22, 2012, the application date. (T. 359-60, 362). The ALJ found at step two of the sequential evaluation that plaintiff's obesity, anxiety disorder, depressive disorder, intellectual disorder, left heel spur, and bilateral foot and ankle tenosynovitis were severe impairments, but that none of them either singly or in combination rose to the level of Listed Impairments at step three.[6] (T. 362-367).

At step four of the sequential evaluation, the ALJ found that plaintiff had the RFC for medium work, together with the additional physical and mental limitations

---

[6] Plaintiff does not claim that his impairments meet the severity of any of the Listed Impairments.

listed in the second hypothetical to the VE stated above. (T. 367). The ALJ stated that in making the RFC determination, he considered all of plaintiff's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. § 416.929 and Social Security Ruling 16-3p. (*Id.*) The ALJ also considered "opinion" evidence in accordance with 20 C.F.R. § 416.927.

The ALJ reviewed the medical evidence and noted that he took plaintiff's obesity into account when formulating the plaintiff's RFC. (T. 368). In addition to citing consultative physicians' reports, the ALJ reviewed the medical records generated by plaintiff's treating physician in discussing plaintiff's ankle/foot impairment. (T. 368-71). In assessing the plaintiff's physical RFC, the ALJ gave most weight to Dr. Tanya Perkins-Mwantuali, who examined plaintiff in November of 2013, and essentially found that plaintiff could perform medium work "with some postural limitations." (T. 375). The ALJ also gave some weight to the other internal medicine consultants, Doctors Pamela Tabb and Kalyani Ganesh, whose opinions the ALJ found consistent with the ability to perform medium work. (T. 375-76).

The ALJ conducted an extensive review of the plaintiff's mental health records, including educational records describing services that plaintiff received while he was still in school. (T. 371-75). The tests discussed by the ALJ included intelligence testing that plaintiff underwent at various times during his life. (T. 371-72). In addition to discussing the reports written by plaintiff's mental health treating providers, the ALJ also discussed three consultative mental health evaluations, one psychological

evaluation for "vocational purposes," and the report written by a State Agency Review Psychiatrist. (T. 372-73).

The ALJ discussed the weight that he gave each report and his reasons for that weight. (T. 376-77). The ALJ gave the most weight to consultative psychologist Denis Noia, who examined plaintiff in November of 2013.[7] (T. 376). The ALJ used Dr. Noia's report to determine that plaintiff could perform simple tasks in a reduced-stress work environment. (*Id.*) The ALJ gave some weight to the consultative report, written by Rachelle Hansen, Psy. D. on August 24, 2012 and some weight to State Agency Review Physician, Dr. Tzetzo, who found that plaintiff should be restricted to a "limited-contact work environment." (T. 376). Finally, the ALJ gave little weight to a report written on November 14, 2016 by Dr. Andy Lopez-Williams, Ph.D., who stated that plaintiff was not "a good candidate for employment, and recommended that he apply for Social Security Disability Benefits." (T. 377). The ALJ noted that Dr. Lopez-Williams also conceded that "the test results upon which he based his disabling assessment . . . potentially involved considerable distortion and were unlikely to be an accurate reflextion of the claimant's objective clinical status." (T. 377). The ALJ also found that Dr. Lopez-Williams's assessment was contrary to all the other opinion evidence of record. (*Id.*)

The ALJ found that plaintiff was unable to perform any PRW based on the VE's opinion testimony. (T. 377). The ALJ then considered the Medical Vocational Guidelines ("the Grids") in determining that if plaintiff could perform the full range of

---

[7] Dr. Noia also examined plaintiff in 2010, but the ALJ found that Dr. Noia's more recent report superceded the older report and outweighed the 2010 opinion. (T. 376-77).

medium work, the Grids would dictate a finding of not disabled based upon plaintiff's age education, and previous work experience. (T. 378) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 203.28). However, the ALJ also considered that plaintiff had nonexertional limitations that would erode the occupational base of medium work. (*Id.*) In order to determine how much his nonexertional limitations would erode the occupational base of medium work, the ALJ considered the VE's testimony and his response to the ALJ's hypothetical question. (T. 377-78). The ALJ also noted that he considered plaintiff's counsel's questioning of the VE, but determined that the "alternative hypothetical" questions posed by counsel involving greater limitations were not supported by the medical evidence in the file. Thus, based on the VE's conclusions, the ALJ found that plaintiff could perform three representative occupations that exist in significant numbers in the national economy, and the plaintiff was therefore, not disabled for purposes of the Social Security Act. (T. 379).

## V.   ISSUES IN CONTENTION

Plaintiff raises the following argument:

1.   The ALJ's credibility analysis is insufficient as a matter of law. (Pl.'s Br. at 11-16) (Dkt. No. 11).

Defendant argues that the Commissioner's determination was supported by substantial evidence and should be affirmed. (Def.'s Br. at 2-12). For the following reasons, this court agrees with defendant and will affirm the Commissioner's decision, dismissing the complaint.

## DISCUSSION

## VI.    EVALUATION OF SYMPTOMS

### A.    Legal Standards

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at *9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167.  Instead, symptom evaluation tracks the language of the regulations.[8] The evaluation of symptoms involves a two-step process.  First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the

---

[8] The standard for evaluating subjective symptoms has not changed in the regulations.  Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167.  The court will remain consistent with the terms as used by the Commissioner.

claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49) (alterations in original).[9]

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (citing superceded SSR 96-7p). The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

The ALJ must provide specific reasons for the determination. *Cichocki v. Astrue*, 534 F. App'x at 76. However, the failure to specifically reference a particular relevant factor does not undermine the ALJ's assessment as long as there is substantial evidence supporting the determination. *Id. See also Del Carmen Fernandez v. Berryhill*, 2019

---

[9] The court in *Barry* also cited SSR 96 7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p. As stated above, the factors considered are the same under both rulings. The 2016 ruling has removed the emphasis on "credibility."

WL 667743 at *11 (citing *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 744 (S.D.N.Y. 2018)). "[R]emand is not required where 'the evidence of record allows the court to glean the rationale of an ALJ's decision.'" *Cichocki v. Astru*, 534 F. App'x at 76 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)).

## B. Application

In this case, plaintiff argues that the ALJ's "credibility" analysis was insufficient as a matter of law and did not provide a discussion of "testimony with which a Court could glean a rationale." (Pl.'s Br. at 11). As stated above, and as noted by defendant, the Commissioner no longer uses the term "credibility" and instead measures the consistency of the plaintiff's subjective complaints with the record as a whole, evaluating the seven factors outlined in the regulations. (Def.'s Br. at 5-12). This court finds that the ALJ's decision followed the requirements of the regulations and properly analyzed the plaintiff's alleged symptoms, both physical and mental.

Plaintiff cites the appropriate factors listed in the regulations, but then focuses only on plaintiff's testimony and argues that the ALJ should have specifically discounted that testimony. Plaintiff states only that "the medical evidence from Plaintiff's early years of schooling through the most recent records reflects ***these impairments and limitations***." (Pl.'s Br. at 15) (emphasis added). There are no specific citations to the medical evidence or to any particular medical record in support of his argument.

In contrast, the ALJ did consider plaintiff's testimony as well as his statements to providers and cited to medical records that do not support the alleged severity of the

plaintiff's symptoms.[10]  With respect to plaintiff's physical impairment, the ALJ

engaged in a lengthy discussion of plaintiff's foot and ankle impairment, citing medical

records indicating that plaintiff's gait was normal, he had full range of motion in his

ankles, and his joints were stable. (T. 368-71) (*see e.g.* T. 277-81 (consultative

examination); T. 768-71 (primary care physician).  The ALJ specifically cited

plaintiff's January 21, 2015 visit to his primary care provider, Dr. Donish Siddiqi, who

referred plaintiff to a podiatrist. (T. 768-71).

Although plaintiff's January 21, 2015 examination was positive for flat feet and

tenderness to palpation, the examination was otherwise "within normal limits." (T. 369,

770).  Dr. Siddiqi noted no weakness of the left ankle. (T. 770).  The ALJ then

discussed plaintiff's February 25, 2015 examination by a podiatrist and his subsequent

treatment from a "podiatry provider" for the foot and ankle discomfort. (T. 370, 775-

77).  On March 16, 2015, Podiatrist Dr. Charles Hobaica, DPM, noted subjective

allegations of "foot pain," rated as aching, moderate in intensity, worse as the day

progressed, and aggravated by standing and walking, but denied instability, loss of

motion and weakness. (T. 775).  Plaintiff was diagnosed with acquired deformity of

ankle and/or foot, pain in limb, and tenosynovitis of the foot and ankle. (T. 775, 777).

Dr. Hobaica noted that plaintiff had not tried anything to alleviate the symptoms. (*Id.*)

---

[10] Plaintiff cites a 1999 case from the Northern District of New York for the proposition that the
ALJ must provide a narrative discussion "to explain what weight he assigned to Plaintiff's statements."
(Pl.'s Br. at 13) (citing *Lewis v. Apfel*, 62 F. Supp. 2d 648, 658 (N.D.N.Y. 1999).  As stated above, the
focus of the ALJ's analysis is no longer "credibility."  The court in *Lewis* also listed the factors in
section 404.1529(c) as necessary to the discussion, and stated that the ALJ may not "merely conclude
that the claimant's statements are not credible." *Id.*  The ALJ in this case did not merely conclude that
plaintiff's statements were not credible and carefully analyzed the medical evidence of record.

Examination of plaintiff's calves, ankles, hindfoot, feet, and toes was normal, range of motion was "pain-free and unlimited," and strength was 5/5 bilaterally. (T. 776). The podiatrist suggested custom foot orthotics for control of the midfoot in an attempt to prevent the progression of plaintiff's foot deformity, increase shock absorption, and assist with daily ambulation. (T. 777).

The ALJ further noted that during a visit with his primary care provider on May 29, 2015, plaintiff stated that even though he had not yet obtained the orthotics, his left ankle pain was better and he was able to walk with "little difficulty." (T. 370). His physical examination was within normal limits, and he had no pain in his left ankle as well as a good range of motion. (T. 370) (citing T. 762). By August 2015, plaintiff told Dr. Siddiqi that he was doing well with his orthotics, and he had "no current issues," the pain did not go beyond "4/10" at home, and the pain was controlled with Ibuprofen. (T. 370) (citing T. 759). The ALJ cited medical reports from June of 2016, and on June 30, 2016, Dr. Siddiqi noted that plaintiff was "[d]oing very well," had improvement with new inserts, was still having pain, but "notes a difference with the inserts." (T. 751). Plaintiff's diagnosis was changed to just flat foot. (T. 371) (citing T. 753).

The ALJ cited a variety of additional medical reports in which plaintiff's physical examinations were within normal limits, and in which he did not make any musculoskeletal or neurological complaints. (T. 371) (citing T. 734-38, 739-43, 744-50, 805-809, 810-14). Several of these cited reports involved plaintiff's psychological complaints as well. Although plaintiff testified at his hearing that he had "a hard time

walking,"[11] he also stated that the inserts helped "sometimes," but the problem was that they "dry out," and he had to get some more. (T. 404).

The ALJ then discussed the weight that he gave the medical reports regarding plaintiff's physical abilities, all of which were consistent with the ability to physically perform medium work "with some postural restrictions." (T. 375-76). The ALJ reviewed and gave appropriate weight to consultants' medical records from November 26, 2013 (Dr. Tanya Perkins-Mwantuali - most weight); August 24, 2012 (Dr. Pamela Tabb - some weight); and June 25, 2010 (Dr. Kalyani Ganesh - some weight). Thus, the ALJ's evaluation of plaintiff's physical symptoms was supported by substantial evidence. The ALJ considered plaintiff's claims of foot pain, and found that the impairment could cause pain and other symptoms, but that based on the medical evidence cited above, including plaintiff's own statements to his medical providers, his conservative treatment (orthotics and Ibuprofen) for the pain, he could still perform the requirements of medium work. Plaintiff's statement that he "had a hard time walking" does not support any greater limitations.

Although the ALJ did not summarize plaintiff's testimony, the ALJ did cite to statements that the plaintiff made to the examining physicians and compared plaintiff's statements to the results of the physical examination. SSR 16-3p specifically states that in evaluating subjective symptoms, the Commissioner will consider statements made by the plaintiff to medical providers or to other sources and evaluate their consistency with

---

[11] Plaintiff did not testify further with respect to his foot/ankle limitations. (T. 403-404). Most of the hearing was devoted to plaintiff's mental impairment and the VE testimony.

plaintiff's allegations of disabling symptoms.[12] SSR 16-3p, 81 FR at 14169. The court can "glean" the ALJ's rationale for his analysis of plaintiff's stated physical symptoms.

Plaintiff argues with respect to his mental restrictions that the ALJ should have considered his testimony that he "always" suffers from paranoia, even in his own home, he has always lived with his mother and cannot function on his own, he does not cook or shop, he has destructive impulses where he becomes angry and punches things, and he was fired from multiple jobs because he could not manage his time. (Pl.'s Br. at 24). Instead, the ALJ extensively reviewed the psychological reports of examinations in the record.[13] (T. 371-75).

The ALJ noted that plaintiff began treating for his psychiatric condition in October of 2009 with an outpatient mental health provider. (T. 372) (citing Exh. B12F - T. 312-18). The ALJ cited a report, dated December 17, 2010, but discussing a June 23, 2010 examination in which plaintiff was diagnosed with schizophrenia and some evidence for comorbid depression, but he exhibited no psychotic symptoms, ***no paranoia***, and no hallucinations. (T. 372) (citing Exh. B6F - T. 258). Plaintiff was given medication for the condition. (*Id.*) The ALJ stated that plaintiff told his mental

---

[12] The court notes that the first ALJ stated that plaintiff would have to take a brief one to two minute break to sit down hourly because of his feet. (T. 18). ALJ Theurer did not include this requirement in his RFC. (T. 367, 420). Based on the evidence in the record, particularly the newer medical records, ALJ Theurer's decision to omit this restriction from plaintiff's RFC was supported by substantial evidence.

[13] Plaintiff states that the ALJ was "refreshingly neutral" in his recitation of the facts, but then finds fault with this recitation because it allegedly fails to provide "clues" for the court to decipher the ALJ's reasoning. (Pl.'s Br. at 13). The ALJ's recitation of the facts is separate from his analysis of plaintiff's RFC and the section in which he discusses the relative weight that he has afforded to the physicians of record. (T. 371-75, 376-77). The ALJ's "neutral" discussion of the facts does not detract from his analysis of the evidence.

health provider in June of 2010 that he was looking for work. (*Id.*) June 23, 2010 was plaintiff's last treating session. (T. 372).

Plaintiff's next several psychological examinations were all consultative. During his June 25, 2010 consultative examination with Dr. Noia, plaintiff stated that he had difficulty falling asleep and usually awakened twice during the night, but did not report any significant depressive, manic, or anxiety related symptoms, or any symptoms of a formal thought disorder or cognitive dysfunction. (T. 372) (citing Exh. B14F - T. 323-26). The ALJ noted that on June 25, 2010, plaintiff admitted that treatment effectively controlled his depressive symptoms, and that he was able to work, but he could not find work. (T. 372) (citing T. 323-24). Later, the ALJ cited Dr. Hansen's consultative examination, during which the plaintiff alleged short-term memory deficits, concentration difficulties, difficulties learning new material, and organizational difficulties. (T. 372) (citing Exh. B1F - T. 231-34). The ALJ then stated "[n]evertheless, [plaintiff] denied having any depressive symptomatology, panic attacks, manic symptomatology or thought disorder." (*Id.*) Plaintiff also acknowledged that he was not receiving any current treatment for his psychiatric condition or prescribed any medications at that time. (*Id.*)

Although there were other consultative mental examinations discussed by the ALJ between 2010 and 2016, he pointed out that after June 23, 2010, plaintiff did not receive any further formal treatment for his mental condition from a mental health provider until December 20, 2016, during which time he presented to a counselor with stuttering speech, auditory and visual hallucinations, distractablility, preoccupied

thought disorder, poor cognitive/intellectual functioning, poor concentration, poor insight, poor judgment, and poor attention. (T. 374) (citing Exh. B21F - T. 728-32). The December 20, 2016 report was written by Kristin Lints, LCSW, a social worker. (T. 732).

On January 6, 2017, plaintiff told his primary health provider that his medications were only having a "small effect," and that he was feeling anxious and depressed.[14] However, plaintiff's mental status examination on the same day showed his mood to be depressed, but he was not anxious and not irritable. (T. 374) (citing Exh. B22F - T. 736-37). On January 9, 2017, plaintiff told his counselor that he was having difficulty managing his emotions and controlling his anger. (T. 374). However, in April of 2017, plaintiff was was discharged from the program because he failed to attend his appointments. (T. 928).

The ALJ noted that on January 24, 2017, plaintiff reported to his primary care provider that he had experienced some improvement in his symptoms with an increased dosage of his medications, but he also complained of being somewhat tired and having difficulty concentrating. (T. 374) (citing (Exh. B24F -T. 810). However, while his mental examination of the same day showed a dysphoric mood, otherwise the findings were within normal limits. (T. 812).

The ALJ then determined the weight that he gave the physicians of record. There were two reports from Dr. Dennis Noia, one from 2010 and the second from 2013. (T.

---

[14] The court notes that on March 16, 2015, when he was attending an appointment for his foot/ankle issues, he denied any psychiatric symptoms. (T. 776). The doctor found plaintiff's attitude "cooperative," and his mood and affect were "normal." (*Id.*) On June 30, 2016, plaintiff stated that he had no anxiety, no depression, and no sleep disturbances. (T. 752).

261-71, 323-26). The ALJ found that the 2013 examination "outweighed" the 2010 examination, in part, because it was based on objective intelligence testing. (T. 376-77). The court also notes that psychological evaluations are based, in part, on the plaintiff's statements of his or her symptoms to the doctor. Dr. Noia's 2013 report contradicts much of the plaintiff's hearing testimony.

Dr. Noia stated that plaintiff did not report any significant depressive, manic or anxiety related symptoms or symptoms of a formal though disorder or cognitive dysfunction. (T. 262). Plaintiff told Dr. Noia that he slept "normally," and that his appetite was normal. There was no claim of paranoia, plaintiff was cooperative, relaxed, and comfortable throughout the testing session. (T. 263). Plaintiff stated that he "usually" gets along with friends and family. (T. 265). There was no mention of anger issues, and at the hearing, plaintiff testified that he can "pretty much keep it in check." (T. 412).

Plaintiff's attention and concentration were good, and he did not evidence significant emotional distress during the evaluation. (T. 263). Plaintiff's testing showed that he was reading at an 11th grade level, and plaintiff himself reported that he was able to dress, bathe, and groom himself. (T. 265). He told Dr. Noia that he could use a microwave, do some general cleaning, but did not know how to do laundry, shop, manage money, drive, or use public transportation, even though he testified that he took the bus to his medical appointments (T. 407) and later stated that he goes outside when he "need[s] to go for the bus." (T. 408). The ALJ stated that he took plaintiff's limitations into account by formulating an RFC that limits plaintiff to simple tasks in a

reduced-stress work environment.[15] (T. 376).

The ALJ then considered the consultative psychiatric evaluation, performed by Rachelle Hansen, Psy. D., from August 24, 2012, which was consistent with Dr. Noia's evaluation. (T. 231-34). The court notes that there is no mention of paranoia in Dr. Hansen's report. Plaintiff told Dr. Hansen that he did not cook, clean, or do laundry because his mother did it. (T. 233). He also reported that he was "close to family members, was not able to drive, but could take public transportation. (*Id.*) Plaintiff also told Dr. Hansen that he spent his days reading and "trying to find a job." (*Id.*) The ALJ also gave some weight to the RFC evaluation by a non-examining State Agency physician, Dr. Tzetzo, and addressing his concerns that plaintiff should be in a low-public contact environment. (T. 376). The ALJ took various mental limitations into account when developing plaintiff's RFC for the VE's hypothetical question. (*Id.*)

The ALJ gave little weight to the opinion rendered by Andy Lopez-Williams, Ph. D. in November of 2016, which was based on a two-day evaluation of the plaintiff. (T. 377). The ALJ found that Dr. Lopez-Williams's opinion that plaintiff was not a good candidate for employment, and that he should apply for disability benefits was inconsistent with every other medical provider in the record. (T. 377). In addition, the ALJ pointed out that Dr. Lopez-Williams stated that the test results were "potentially involved considerable distortion and were unlikely to be an accurate reflection of the claimant's objective clinical status." (*Id.*) (citing T. 716). The report states that there

---

[15] The court notes that Dr. Noia found no limitations regarding plaintiff's ability to deal with stress, as did Dr. Rachelle Hansen, Psy. D. on August 24, 2012. (T. 233). However, the ALJ limited plaintiff to reduced-stress work, giving plaintiff's allegations some consideration.

were indications suggesting that plaintiff "tended to portray himself in an especially negative or pathological manner. This pattern is often associated with a deliberate distortion of the clinical picture." (T. 716). The doctor stated that "the interpretive hypotheses that follow in this report should be viewed cautiously." (*Id.*)

While the ALJ did not use the term "credibility" because the Commissioner no longer uses that term, it is clear that the ALJ assessed plaintiff's allegations and found that they were not consistent with the evidence of record, including his own statements to medical providers. Notwithstanding Dr. Lopez-Williams's finding that plaintiff was not a good candidate for work, and his opinion that plaintiff should apply for Social Security benefits, he did recognize that plaintiff's responses could have been distorted and not an accurate reflection of plaintiff's abilities. It was the province of the ALJ to resolve conflicts in the evidence. *Anselm v. Commissioner*, 737 F. App'x 552, 556 (2d Cir. 2018) (citing inter alia *Veino v. Barnhart*, 312 F.3d 578, 588-89 (2d Cir. 2002); *Mongeur*, 722 F.2d at 1038). The court defers to such resolution. *Id.* (citation omitted). *See also Suttles v. Berryhill*, No. 18-1790, __ F. App'x __, 2019 WL 990802, at *2 (2d Cir. Feb. 28, 2019) (even though the court still used the term "credibility," the court noted that plaintiff's testimony regarding her symptoms was contradicted by the medical evidence, and the ALJ properly made specific references to clinical findings, diagnostic tests, and treatment reports from the plaintiff's doctors). Thus, the ALJ's analysis of plaintiff's symptoms and his subsequent RFC were supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the Commissioner's decision is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is further

**ORDERED**, that judgment be entered for the **DEFENDANT**.

Dated: March 7, 2019

Hon. Andrew T. Baxter
U.S. Magistrate Judge